Vanessa R. Waldref
United States Attorney
Eastern District of Washington
David M. Herzog
Lisa M. Cartier-Giroux
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone:  (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 2:23-CR-00113-RMP-1 |
| Plaintiff, | United States' Sentencing Memorandum |
| v. | |
| JOHNATHAN LESLIE ALLEN (a/k/a "Ghost"), | Sentencing Hearing: February 13, 2023, at 11:00 a.m. |
| Defendant. | |

Plaintiff United States of America, by and through Vanessa R. Waldref, United States Attorney, and David M. Herzog and Lisa M. Cartier-Giroux, Assistant United States Attorneys, hereby submits the United States' Sentencing Memorandum for Defendant Johnathan Allen.  The United States recommends a Guidelines sentence of 293 months in custody, 5 years of Supervised Release, no fine, no restitution, and a mandatory special assessment of $400.  The United States' position is based on the trial, attached memorandum, case exhibits, files, and records, and argument the Court permits.

Dated:  February 6, 2024

Vanessa R. Waldref
United States Attorney

*s/ David M. Herzog*
David M. Herzog
Lisa M. Cartier-Giroux
Assistant United States Attorneys

United States' Sentencing Memorandum – Allen – i

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    Introduction**

3        Defendant Johnathan Allen ("Defendant" or "Allen") is a heroin, cocaine,

4   fentanyl, and methamphetamine dealer who possesses, carries, and distributes

5   firearms.  A jury convicted him of engaging in a methamphetamine conspiracy,

6   distributing methamphetamine, and possessing firearms on two separate occasions

7   after having sustained prohibiting felonies.

8        Defendant's criminal history is extensive and violent.  During the conduct

9   giving rise to his attempted robbery conviction, he grabbed and choked his victim

10   in a car, held him by the throat, threatened to use brass knuckles on him, beat him

11   on the head with brass knuckles until they were bloody, and participated in robbing

12   him of a large amount of cash.  In the years between that assault and his arrest in

13   this case – setting aside the multiple residential burglaries, theft, and trespass

14   convictions he sustained as a juvenile – Defendant has engaged in a cornucopia of

15   criminal conduct.  He has convictions for: theft, using the pretense of a prostitution

16   date to rob a "John" at gunpoint (with an airsoft pistol), assault, resisting arrest,

17   repeatedly giving a false name to police, possessing dangerous weapons including

18   brass knuckles and a hunting knife while barricading himself in a house,

19   possession of methamphetamine in connection with being in possession of stolen

20   scooters and .45 caliber ammunition, and carrying a loaded large-frame revolver

21   despite being a prohibited person by virtue of a prior felony.  ECF No. 124 at

22   ¶¶ 95-126.  While in custody, he continued his violent and antisocial behavior by

23   punching another inmate in the face and continuing to punch him while he was on

24   the ground.  *Id.* at ¶¶ 120-22.

25        Sanctions have not deterred him.  In just the four-month period from

26   October 1, 2022, through February 7, 2023, his Facebook account contains more

27   than two thousand pages showing near-continuous illegal gun and drug trafficking,

28   violent and threatening behavior, and other criminal activity.  *See* Gov't Exh. A.

United States' Sentencing Memorandum – Allen – 1

However, none of the relevant conduct documented in his Facebook account has led to any criminal history points in his Presentence Investigation Report ("PSIR"). Without consideration of the conduct in those records, he falls in Criminal History Category V, based on 10 criminal history points. That calculation is proper under the Guidelines, but it significantly underrepresents his actual criminal history – not only because of the uncounted conduct in his Facebook account, but because it is based only on his adult convictions (several of which are now uncounted under *State v. Blake*, 197 Wn.2d 170 (2021)) and because it fails to take into account his possession of a loaded, chambered firearm at Northern Quest Casino at his arrest in February 2023.

Defendant's willingness to carry loaded firearms, particularly while high on methamphetamine, endangers individuals around him. His ability to obtain and distribute multi-ounce quantities of methamphetamine, especially while having access to firearms, endangers the community around him. And his capacity for physical violence, both in and out of custody, endangers anyone with whom he disagrees. Taking into account the factors set forth at 18 U.S.C. § 3553(a), including his personal history of criminality and violent characteristics, the serious and unabated nature and circumstances of his offenses, his undeterrability, his lack of respect for the law, and his lifetime of antisocial conduct, as well as his relevant conduct, the United States respectfully submits that a sentence of 293 months, at the high end of the properly-calculated Guidelines range, is appropriate.

If Defendant – a person with a years-long pattern of criminal activity, including violence, who has been convicted of dealing large quantities of methamphetamine, and who was arrested while carrying a loaded, chambered gun at a casino – has not earned a sentence at the high end of the Guidelines, it is difficult to envision any defendant who would qualify. He has lived in Spokane all of his life and has chosen to commit his crimes in this community. Because of those choices, the time has now come to protect the Spokane community from him.

## II.    Facts

The facts relevant to Defendant's convictions were adduced at trial before the Court in November 2023 and are set forth in the relevant paragraphs of the Offense Conduct section of the PSIR.  ECF No. 124, at ¶¶ 11-66.

The facts are not complicated.  On October 27, 2022, Defendant engaged in multiple text and Facebook communications with codefendants Joshua Fisher ("Fisher") and Quinton Brown ("Brown") to obtain at least six "zips," or ounces, of methamphetamine to sell to Fisher's buyer "Jay," who, unbeknownst to any of the coconspirators, was an undercover agent ("UCA") working with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  Defendant used Facebook to set up a meeting with Brown to obtain the methamphetamine, and Defendant then accompanied Fisher to a Wal-Mart in Spokane Valley.  In the parking lot at Wal-Mart, Fisher got into the UCA's vehicle to sell the methamphetamine to the UCA.  Immediately thereafter, Defendant instructed Fisher to go to an apartment on Pines in Spokane Valley, where he picked up a Ruger 9mm firearm and came back outside.  The next day, Defendant offered Fisher the ability to sell "the Ruger" to the UCA.  He then brought a Ruger 9mm firearm to the Spokane Transit Authority bus plaza in downtown Spokane, where he gave it to Fisher to sell to the UCA.  Fisher, Allen, and Brown (along with Austin Watson, who did a standalone methamphetamine deal with Fisher) were indicted in January 2023, and a warrant was issued for Defendant's arrest.  On February 7, 2023, Defendant was arrested on the gaming floor of the Northern Quest Casino just outside Spokane, with a loaded, chambered 9mm firearm in the pocket of his sweatshirt.

Pretrial litigation resulted in the severance of the three original codefendants (Fisher, Brown, and Watson), each of whom accepted responsibility for his own conduct, pleaded guilty, and is awaiting sentencing.  The Court also dismissed without prejudice the original indictment (23-CR-00002-RMP) for a violation of the Speedy Trial Act, leading to a new indictment charging Allen alone.

United States' Sentencing Memorandum – Allen – 3

In the above-captioned case (23-CR-00113-RMP), Allen proceeded to trial on four counts: one count of conspiracy to distribute methamphetamine with Fisher and Brown, one count of methamphetamine distribution for the drug deal on October 27, 2022, and two counts of being a felon in possession of a firearm or ammunition on October 28, 2022, and February 7, 2023, respectively. After four days of trial testimony and several hours of deliberations, the jury returned guilty verdicts on all counts.

## III.    The Presentence Report

For purposes of calculating the appropriate range under the United States Sentencing Guidelines (the "Guidelines"), the United States concurs with the United States Probation Office that the following Guidelines calculations apply:

| Offense Level / Enhancements | Level/Adj. | Guidelines Section |
|---|---|---|
| Between 150-500 grams of methamphetamine | 32 | U.S.S.G. § 2D1.1(a)(5), (c)(4) |
| Possession of a dangerous weapon (firearm) | +2 | U.S.S.G. § 2D1.1(b)(1) |
| Final adjusted offense level | 34 | |

ECF No. 124, ¶¶ 72-80.

The Probation Officer has correctly concluded that Defendant's criminal history computation includes 10 total criminal history points, placing him in Criminal History Category V. ECF No. 124, ¶ 127. In Category V and offense level 34, Defendant's range is 235-293 months in custody. ECF No. 124, ¶ 184. Defendant's convictions on Counts 1 and 2 each carry a mandatory minimum sentence of 120 months, which the Court may run concurrently or consecutively. *See* 18 U.S.C. § 3584. The Court must impose a term of Supervised Release that may be up to life, but cannot be fewer than five years. ECF No. 124, ¶ 184. Defendant has no assets or income but has two children to support; the United States does not seek any fines or restitution beyond the $400 special assessment.

## IV.    Defendant's Objections to the Presentence Report

In response to the Probation Officer's draft PSIR, Defendant requested a number of corrections and additions.  The United States opposed each of these requests with significant briefing and citations to trial exhibits.  ECF No. 133.  The United States stands on that record but now must make a few additional points, necessitated by Defendant filing ECF No. 138, a document characterized as a reply to the United States' opposition.

First, with regard to Defendant's Facebook records, the United States continues to be puzzled by Defendant's insistence that because the Court limited *the jury's* consideration of Defendant's Facebook evidence at trial under Federal Rules of Evidence 403 and 404(b), the *Court* should be limited in considering Defendant's Facebook evidence at sentencing.

Courts receive all kinds of information at sentencing that juries never consider when they are determining innocence or guilt.  Indeed, the Court's mandate at sentencing is to impose a fair and just sentence after considering all of the information it can about Defendant as a whole person.  *See* 18 U.S.C. § 3553(a).  This information includes not only his offense conduct and respect for the law, but also his personal history and characteristics, his prior convictions and criminal history, his methamphetamine use, his family circumstances and upbringing, his educational and employment record, and his ability to pay financial penalties.  Defendant's Facebook records provide contemporaneous first-person insight into what he was thinking, saying, and doing.  In the language of the sentencing statute, his Facebook communications demonstrate the seriousness of his offense conduct, his relevant conduct, his lack of respect for the law, the need to deter him, and his personal history and characteristics.  Accordingly, the Court not only *can* consider his Facebook communications, but *should* consider them in fashioning a fair and just sentence that takes into account the whole person before it.

United States' Sentencing Memorandum – Allen – 5

1    Defendant asserts that despite the fact that the jury believed beyond a
2  reasonable doubt that he used Facebook to set up the charged methamphetamine
3  deal, the Court should simply ignore the relevant conduct of his other drug dealing,
4  violence, retribution, and gun crimes – all of which come from the same Facebook
5  account.  ECF No. 138 at 2-3 (referencing PSIR ¶¶ 61-66).  Defendant claims that
6  because his sister Shivara Hamm (ne Allen) testified that she believed she had
7  communicated with people other than Defendant on his Facebook accounts.  *Id.*
8  But the messages authored by the Facebook user "John Allen," contain information
9  consistent with Defendant John Allen's actual identity information, which he often
10  gave in the messages themselves, including his use of the 7455 phone number,
11  messages about "John Allen's" location on dates and places where Defendant was
12  seen by law enforcement (Spokane Valley on October 27, 2022, and Northern
13  Quest Casino on February 7, 2023), his lack of a vehicle and need for rides, his
14  parental status, his residence information, his familial relationships, and other
15  identifying information.  The substantive information in the messages is also cross-
16  corroborating and consistent – including Defendant's frequent use of the exact
17  same phrase for the sale of "fire ass clear" (that is, high-quality methamphetamine)
18  at specified prices.  Based on context, the specific language used, the identifying
19  indicia of Defendant John Allen as Facebook user "John Allen" and "Ghost," and
20  the messages themselves, the overall import of Exhibit A (the 2,000 pages of
21  Defendant's Facebook account referenced in PSIR ¶¶ 61-66) is that the United
22  States has established by a preponderance of the evidence that the messages in
23  Exhibit A, like the Facebook messages introduced at trial, are Defendant's.

24    Notably, Defendant's sister also admitted that she communicated with
25  Defendant on this Facebook account, as demonstrated in trial Exhibit 304
26  (communications between Defendant and Ms. Hamm).  Thus, if Defendant has a
27  basis to challenge any of the specific statements attributed to the Facebook user
28  "John Allen" in Exhibit A as not genuinely having come from Defendant

Johnathan Leslie Allen, aka "Ghost," the United States requests that Defendant identify those particular statements and his particularized basis for asserting that they did not come from Defendant John Allen, so the United States can fairly respond.

Finally, the United States submits that Defendant's proposed requirement that a firearm and drugs *must* be "bundled" for the Court to apply the two-level enhancement under U.S.S.G. Section 2D1.1(b)(1), is inconsistent with *United States v. Gomez*, 6 F.4th 992, 1008-10 (9th Cir. 2021) and other Ninth Circuit precedent.

As *Gomez* itself sets forth, the enhancement is applicable "if a dangerous weapon (including a firearm) was possessed." *Id.* (citing Section 2D1.1(b)(1) (cleaned up)). In *Gomez*, the enhancement obviously applied, because "the sale of the firearm and methamphetamine were bundled together." *Id.* at 1010. But contrary to Defendant's narrow position that such bundling is *required* for the enhancement to apply, neither *Gomez* (nor any other case cited by Defendant or located by the United States) actually requires a firearm and drugs to be bundled together, on the Defendant's person, or even in the same location, for the enhancement to apply.

Instead, as the Ninth Circuit explained at length in *Gomez*, that court "interpret[s] the § 2D1.1(b)(1) enhancement broadly":

> We have held that possession of the firearm may be actual or constructive, *United States v. Lopez-Sandoval*, 146 F.3d 712, 714–15 (9th Cir. 1998), and that the firearms and drugs need not "be found in proximity to each other," *United States v. Willard*, 919 F.2d 606, 610 (9th Cir. 1990). Even when defendants were arrested miles away from the firearms stored at their homes or places of business, we held that the defendants possessed weapons during the commission of the drug-trafficking offenses for purposes of this sentencing enhancement. *Lopez-Sandoval*, 146 F.3d at 715; *see also United States v. Stewart*, 926 F.2d 899, 901–02 (9th Cir. 1991).

*Gomez*, 6 F.4th at 1008.

United States' Sentencing Memorandum – Allen – 7

Because the enhancement is broadly applied, and because an enhancement under § 2D1.1(b)(1) is appropriate "based on all of the offense conduct, not just the crime of conviction" under *United States v. Boykin*, 785 F.3d 1352, 1364 (9th Cir. 2015), the Ninth Circuit concluded that it was appropriate to "determine whether any of Gomez's underlying offense conduct was sufficient to justify the enhancement." *Id.* at 1009.  In *Gomez*, consideration of all of the defendant's conduct caused the Ninth Circuit to reject his argument that it was "clearly improbable that the weapon was connected with the offense," under U.S.S.G. § 2D1.1(b)(1), comment n.11(A), where he had sold an unloaded gun to his drug buyer.  *Id.*

Here, likewise, Defendant makes the same argument that the enhancement should not apply because on October 27, 2022, his "shooter" – that is, the Ruger 9mm pistol – was at the apartment complex on Pines while he conducted his drug deals in Brown's car and the Wal-Mart parking lot a few miles away.  *See* ECF No. 132 at 3-5; ECF No. 138, at 3-4.  According to Defendant, because he did not possess the drugs and gun at the same time in the same place, they were not "bundled" together and therefore it is clearly improbable that the weapon was connected with the drug offense.  *Id.*

But the Ninth Circuit has already foreclosed this argument, not only in *Lopez-Sandoval* and *Willard*, under which the enhancement applies to actual and constructive possession of guns and to guns recovered miles away from drug deals, *see supra*, but in *Gomez* itself, which held that "the application note also states that this enhancement 'reflects the increased danger of violence when drug traffickers possess weapons.'" *Gomez*, 6 F.4th at 1008-09 (citing U.S.S.G. § 2D1.1(b)(1) comment n.11(A)).

Accordingly, the Ninth Circuit held in *Gomez*:

We have also interpreted this application note broadly.  In determining whether the weapon "was connected with the offense," *id.*, we have concluded that the "offense" in this context refers to "the entire course

1
2
3
4
5
6
7

of criminal conduct," not just the crime of conviction, *Willard*, 919 F.2d at 609–10.  This is consistent with the broad language of § 1B1.3, which provides that specific offense characteristics such as § 2D1.1(b)(1) take into account all acts and omissions that occurred "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(1)(B).  We have also held that the fact that a firearm was unloaded does not make it "clearly improbable that the weapon was connected to" the drug offense. *Lopez-Sandoval*, 146 F.3d at 716 (cleaned up).

8

*Id.* at 1009.

9
10
11
12
13
14

Where a firearm *is* bundled together with a drug deal, as in *Gomez*, the enhancement clearly applies.  But because the enhancement is "based on all of the offense conduct, not just the crime of conviction," *Gomez*, 6 F.4th at 1009, quoting *Boykin*, 785 F.3d at 1364, it *also* applies where the Court determines that "*any* of [Defendant's] underlying offense conduct was sufficient to justify the enhancement." *Id.* (emphasis supplied).

15
16
17
18
19
20
21
22
23
24
25

Here, as the United States set forth at length in ECF No. 133, immediately before meeting up with Fisher to go do the methamphetamine deals on October 27, 2022, Defendant sent a Facebook message in which he was specifically looking for a ride to Spokane Valley "go pick up [his] shooter on Pines."  *See* ECF No. 133, at 13-14; Trial Exhibit 310 (Facebook message).  Then, immediately after leaving the drug deal at Wal-Mart, Defendant instructed Fisher to take him to the apartment on Pines, where he picked up a Ruger 9mm.  ECF No. 133, at 13-14.  And as Paragraph 66 of the PSIR notes, on October 25, 2022, two days *before* he picked up the Ruger 9mm firearm at the apartment on Pines, Defendant was already indicating on Facebook that he wanted to get his "thang thang" (slang for a firearm).  ECF No. 124 at ¶ 66.

26
27
28

Thus, "based on all of the offense conduct, not just the crime of conviction," *Gomez*, 6 F.4th at 1009, *quoting Boykin*, 785 F.3d at 1364, it is clear that on October 27, 2022, Defendant constructively possessed, and went to get, the Ruger.

The enhancement applies.  As *Gomez* itself held, "[u]nder our case law, the government does not have to establish that the defendant possessed the firearm for the purpose of protecting or facilitating the drug transaction.  Indeed, the firearms need not be 'involved in the crime of conviction.'"  6 F.4th 1010 (quoting *Willard*, 919 F.2d at 609).  Whether the Ruger was loaded is irrelevant for purposes of applying the enhancement.  *Id.* ("Nor is it relevant that the firearms were unloaded.") (quoting *Lopez-Sandoval*, 146 F.3d at 714–15).

Accordingly, the United States respectfully submits that the two-level firearm enhancement set forth at U.S.S.G. § 2D1.1(b)(1) and applied by the Probation Officer, is appropriate on these facts.  Like *Gomez*, this is not a case in which a drug dealer's possession of a firearm is separate from the drug deal itself, like a "hunting rifle locked in a closet," *Gomez*, 6 F.4th at 1010 (citing App. N.11(A)).  Even though there is no "bundling" requirement in the Ninth Circuit as Defendant asserts, he did in fact "bundle" his gun and drug conduct by going to Spokane Valley on October 27, 2022, to do a drug deal *and* "go pick up [his] shooter" as he indicated in Facebook messages from that night.

Finally, as a matter of public policy, this case and Defendant's repeated willingness to obtain, possess, and carry guns while engaging in drug deals demonstrates why the safety concerns articulated in Application Note 11(A) and *Gomez* make sense: this enhancement "reflects the increased danger of violence when drug traffickers possess weapons." *Gomez*, 6 F.4th at 1009 (citing App. Note 11(A)).  The United States respectfully submits that the enhancement applies here, as the Probation Office concluded in the PSIR.

## V.    The United States' Sentencing Recommendation

In light of Defendant's life of criminality, demonstrated acts of violence, ongoing and significant drug dealing, dangerousness and repeated possession of loaded firearms (including while using methamphetamine daily), underrepresented criminal history, and lack of remorse or acceptance of responsibility, the United

1  States respectfully recommends a Guidelines sentence of 293 months in custody, 5

2  years of supervised release, no fine, no restitution, and a mandatory special

3  assessment of $400.  The United States acknowledges that this is a significant

4  sentence and respectfully submits that it is appropriate but no greater than

5  necessary to achieve the statutory goals of sentencing and factors set forth at 18

6  U.S.C. § 3553(a).

7         **A.     Defendant's Serious Offense and Lack of Respect for the Law**

8         Defendant's Guidelines range is based on three things: the criminal history

9  points he earned based on his prior convictions and sentences (10 points), the large

10  quantity of methamphetamine that he conspired to distribute and distributed in

11  October 2022 (offense level 32), and his constructive possession of a Ruger 9mm

12  pistol on October 27, 2022 (2-level enhancement under Guidelines Section 2D1.1).

13  All of that misconduct is serious, and all of it warrants serious punishment.

14         But that analysis also severely understates the actual dangerousness of

15  Defendant's criminal conduct.  In February 2023, completely separate from his

16  methamphetamine and firearm conduct in October 2022, Defendant knowingly and

17  illegally possessed a different loaded 9mm firearm, with a bullet in the chamber, in

18  the pocket of his sweatshirt in the middle of the afternoon at a busy casino.

19         Because his drug quantity from October 2022 was significant enough to

20  yield offense level 32, and his felon-in-possession offense level from February

21  2023 is more than 9 levels lower (offense level 20, based on possession of a single

22  firearm after one conviction for attempted robbery, a crime of violence), the

23  Guidelines advise the Court to disregard his February 2023 firearm possession at

24  Northern Quest Casino in calculating his offense level under the grouping analysis

25  set forth at Section 3D1.4.  Thus, what was likely Defendant's most immediately

26  dangerous charged conduct – walking around a casino with a loaded, chambered

27  firearm while he was using methamphetamine daily – actually goes unaddressed by

28  the Guidelines' offense level calculations.

To accommodate situations like this, the same section of the Guidelines, Section 3D1.4(c), suggests that the Court impose a high-end sentence to take into account dangerous misconduct that is otherwise unaddressed by grouping analysis. In the language of the Guidelines, a Group 9 or more levels less serious (the firearm at the casino) than the Group with the highest offense level (the methamphetamine from October 2022) "may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level." U.S.S.G. § 3D1.4(c). Here, a just sentence should take into account Defendant's conduct at the casino, which is one of several reasons the United States is seeking a sentence at the high end of the properly-calculated Guidelines range of 235-293 months.

A sentence lower than the high end of the Guidelines range would fail to hold Defendant accountable for seriously endangering others (and himself) by carrying a loaded firearm in the pocket of his sweatshirt at the casino. At that time, by his own admission, Defendant was using methamphetamine daily. ECF No. 124 at ¶ 148. With a bullet in the chamber, myriad circumstances could have led to tragedy: if Defendant had tripped, been bumped into, or inadvertently dropped the gun, it could have discharged. If he was indeed high on methamphetamine that day while carrying a loaded firearm, one can only shudder at what might have happened if law enforcement had not intervened before a dealer had a chance to deal him a bad hand, or he lost at the slots, or someone treated him disrespectfully on the gaming floor. In short, it is a miracle that nothing truly tragic happened that day, thanks to proactive law enforcement work, communication, and a safe arrest.

Defendant's sentence should account for what he did at the casino. But his criminal history is meaningfully understated in other ways, too. Before he was an adult, he had engaged in five incidents in which he unlawfully entered a building or home, burglarized the home, or stole something from another person. ECF No. 124, ¶¶ 84-94. In one incident, he broke into a house through a window and stole a rifle and ammunition, electronics, and jewelry; his fingerprints were on the jewelry

1    box.  *Id.* at ¶ 87.  Two days later, he kicked in the window of another home to steal

2    electronics and jewelry; again his fingerprints were on a jewelry box.  *Id.* at ¶ 90.

3    Four days after that, in what must have been a terrifying experience for his victim,

4    he broke into a home to burglarize it, was interrupted by the homeowner, and fled,

5    dropping a crowbar.  *Id.* at ¶ 92.  He also stole an MP3 player from one student and

6    stole and sold the cell phone of another.  *Id.* at ¶ 94.

7         Although certainly frightening to the people who were robbed, perhaps some

8    of Defendant's juvenile misconduct can be attributed to poor youthful decision-

9    making – and he received minimal sanctions that do not count against his criminal

10   history.  But neither the experience of being arrested and detained, nor community

11   custody, nor community service, nor being on probation, nor the actual sanctions

12   imposed, did anything to deter Defendant.  As soon as he turned 18, he graduated

13   to more serious, violent crime: what appears in his criminal history as "attempted

14   first degree robbery" consisted of choking out and beating his victim bloody with

15   brass knuckles while robbing him.  *Id.* at ¶¶ 95-99.  For this crime he was

16   sentenced to 30.75 months and accrued three criminal history points.

17        What matters more to the United States than the length of his sentence is that

18   he resolved to rob someone with a group of other people, and had no reservations

19   about committing the robbery in a way that was cruel, violent, and unnecessary to

20   commit a simple robbery.  He punched his victim, held him by the throat, and

21   repeatedly beat him with brass knuckles until "he was bleeding from his face and

22   blood was all over the inside and outside of his vehicle."  *Id.* at ¶ 99.

23        For a theft conviction in 2011 for which details are unavailable, he was

24   originally sentenced to 45 days suspended, but presumably violated his terms of

25   release, because he ended up serving 44 days.  *Id.* at ¶ 100.

26        Then, in 2012, while admittedly acting as "security" for his girlfriend's

27   "escort meetings" (plural), Defendant engaged in the kind of robbery that can, and

28   often does, escalate into serious violence.  To rob someone, he and his girlfriend

United States' Sentencing Memorandum – Allen – 13

1   set up a prostitution date on Backpage.com. *Id.* at ¶¶ 102-107. Defendant

2   accompanied his girlfriend to the encounter near Pullman, Washington. *Id.* Once

3   the customer had given them $240 for the commercial sex act, Defendant and the

4   woman attempted to disengage and leave, causing the customer to come outside

5   with a folding knife. *Id.* Defendant pointed an airsoft pistol at him "that was

6   designed to look like a Glock handgun," and left him $50. *Id.* Defendant and his

7   girlfriend made a number of false statements to the police, including Defendant

8   giving the false name "Christopher Allen." *Id.*

9         For this conduct, Defendant was convicted of attempted promotion of

10  prostitution in the second degree, unlawful display of a weapon, and making a false

11  statement to a public servant. *Id.* He was sentenced to 364 days, with all but 30

12  days suspended. *Id.* Because the sentence was less than a year, he received only

13  one criminal history point for purposes of the Guidelines. *Id.*

14        The United States submits that the short length of that sentence significantly

15  understates not only the inherent dangerousness of Defendant's conduct, but the

16  sexual, emotional, and psychological harm inherent to "providing security" for a

17  commercial sex transaction that would have constituted attempted human

18  trafficking in violation of federal law if it had involved force, fraud, or coercion.

19  Receiving a single criminal history point for this conduct dramatically understates

20  Defendant's meaningful criminal history and respect for the law.

21        After another theft conviction in 2015 for which he was sentenced to 44 days

22  in custody, *id.* at ¶ 108, Defendant trespassed into a home, where he barricaded

23  himself and came out only when law enforcement told him a K9 was en route. *Id.*

24  at ¶¶ 110-13. When he came out he again had brass knuckles, along with a hunting

25  knife, ziplock baggies, and methamphetamine, and again lied to officers about his

26  identity. *Id.* This conduct, which also garnered only a single criminal history

27  point, demonstrates that the methamphetamine distribution conduct on which he

28  was convicted in this case was not his first go-round with distributing

United States' Sentencing Memorandum – Allen – 14

1   methamphetamine. Coupled with his earlier lies to law enforcement about his
2   identity, and his subsequent conviction for fleeing from police and resisting arrest
3   in 2016, *id.* at ¶¶ 114-16, this conduct also evinces his lack of respect for the law.

4       Then, in 2018, while in custody at Geiger, Defendant punched another
5   inmate in the face and continued punching him while he was on the ground. *Id.* at
6   ¶ 122. This constituted another violent assault for which Defendant has received
7   only one criminal history point.

8       A few months later, at the end of 2018, during the period in which he
9   acknowledges he was using methamphetamine daily, Defendant was arrested on a
10  warrant after attempting to flee from police. *Id.* at ¶¶ 123-25. Undeterred by his
11  prior sanctions or his attempted robbery conviction – which prohibited him from
12  possessing a firearm – he was riding around on a bicycle with a loaded firearm in
13  his belt. *Id.* He was convicted and sentenced to 18 months in custody for unlawful
14  possession of the firearm, and accrued three criminal history points for that
15  conviction.

16      What concerns the United States more than the points he received is how
17  similar his 2018 conduct was to his 2023 conduct at Northern Quest, where he
18  carried a loaded firearm while he was admittedly a daily methamphetamine user.
19  Defendant appears to be undeterrable, and has no compunction about carrying
20  loaded weapons around others, regardless of his prior convictions or whether he is
21  using methamphetamine. That is dangerous conduct from which the public
22  deserves to be kept safe.

23      Defendant's criminal history is further understated because of the windfalls
24  he received following the Washington Supreme Court's decision in *State v. Blake*,
25  197 Wn.2d 170 (2021). In 2017, two motor scooters were suspected to have been
26  stolen by "Ghost" (Defendant's moniker). *Id.* at ¶¶ 117-19. When law
27  enforcement contacted Defendant on a scooter with a punched-out ignition panel,
28  he initially refused to provide his name but admitted the scooters were not his. *Id.*

Eventually he identified himself and was arrested on a DOC warrant and was searched incident to arrest.  *Id.*  Police found methamphetamine and drug paraphernalia and a BB gun; they did not locate a firearm, but Defendant had a .45 caliber magazine loaded with ammunition.  *Id.*

Defendant was charged and convicted *only* of simple possession of methamphetamine, which was a common way to resolve cases in the pre-*Blake* era. He was sentenced to 81 days.  *Id.*  But because four years later *Blake* retroactively reversed all simple drug possession convictions in Washington, his 2017 drug conviction now yields zero criminal history points.  *Blake* means that Defendant, who could have been charged with various non-drug offenses in 2017, receives no criminal history points for any of his conduct that day – which in turn, makes his criminal history understated.  He was not charged with or convicted of possession of stolen property, unlawful possession of ammunition, lying to an officer, or any other potentially point-generating conduct; he resolved all of his criminal conduct with a single charge that unforeseeably would later be vacated by *Blake*.

Likewise, he sustained 2016 and 2018 drug convictions that were resolved without charges for possession of a stolen vehicle or any other potential point-generating convictions and subsequently vacated by *Blake*.  *Id.* at ¶¶ 132-37. Because it is impossible to go back in time to charge non-drug conduct that would have survived *Blake*, there is no way to calculate Defendant's true point-generating conduct.  The United States seeks a high-end sentence in this case in part because *Blake* has caused Defendant's overall criminal history to be understated.

Finally, in addition to everything set forth above, Defendant's Facebook records also demonstrate that his criminal history is understated: his relevant conduct includes numerous uncharged drug deals and gun crimes.  To wit, during just the four months for which the United States obtained Defendant's Facebook account, he communicated with at least 15 individuals, in no fewer than 55 communications, about distributing drugs.  ECF No. 124 at ¶ 61.

United States' Sentencing Memorandum – Allen – 16

1    Other than the charged drug deal proven in part by Defendant's Facebook
2    communications with Quinton Brown on October 27, 2022 (trial Exhibit 312), law
3    enforcement obviously did not apprehend Defendant for any of these other drug
4    interactions.  But Defendant was dealing in heroin, cocaine, fentanyl-laced pills,
5    *and* methamphetamine, *id.* at ¶ 62, which is relevant – and troubling – conduct.
6    The United States submits that paragraphs 61-66 of the PSIR demonstrate not only
7    Defendant's familiarity with gun and drug dealing and specific distribution
8    language and conduct, but his willingness to use violence and retaliate.  Notably,
9    paragraph 66 references Defendant indicating to another person that he wants to
10    get his "thang thang" (slang for a firearm) two days before he picked up "the
11    Ruger" 9mm firearm at an apartment on Pines on October 27, 2022.

12    Defendant's charged and relevant conduct is unquestionably serious, and
13    merits a significant sentence.  He is a criminal Jack-of-all-trades – he has engaged
14    in illegal drug and gun conduct, to be sure, but has also robbed houses and people,
15    and engaged in violence in and out of prison to the detriment of this community.

16    In terms of employment, the PSIR indicates that he has not been employed
17    since 2020 – but that is true only if drug dealing and benefit fraud do not count.
18    The Court may recall trial exhibits 307A and 309, which showed a Facebook
19    message from Defendant indicating that he wanted to sell his public benefits card:



| Session | Date/Time | Sender ID | Sender Name | Message |
|---|---|---|---|---|
| 7549 | 10/18/2022 09:32:17 | 100076258441367 | John Allen | You sent a photo.  attachments/0661763232.jpg |
| 7550 | 10/18/2022 09:37:10 | 100076258441367 | John Allen | You sent a video.  unified_message_423385043282125.mp4 |
| 7551 | 10/18/2022 10:27:20 | 100076258441367 | John Allen | I got a new card 4sale,, do you want 2buy it |

28    Trial Exhibit 307A.

United States' Sentencing Memorandum – Allen – 17

Defendant argues that he was not necessarily the user of the "John Allen" Facebook account, but the user of the "John Allen" Facebook account appears to have received mail that the Washington State Department of Health and Social Services had sent Defendant Johnathan L. Allen.  The close-up image of the letter included the specific value of the public benefits on the card.  Presumably, Defendant was trying to sell the card for immediately-usable cash, at a figure lower than the actual value of the benefits (so his buyer would also be advantaged):



Trial Exhibit 309.

United States' Sentencing Memorandum – Allen – 18

Against this overall landscape, it is difficult to conclude that Defendant has any respect for the law.  When coupled with his recidivist criminal history, serious drug dealing and gun misconduct in this case, and refusal to learn any lessons from his prior significant custodial sentences, it is clear that a sentence that promotes respect for the law is important here.  *See* 18 U.S.C. § 3553(a)(2)(A).  Defendant has earned a sentence at the high end of his Guidelines range: 293 months.

### B.    Defendant's Personal History and Characteristics

Defendant may seek to articulate facets of his personal history and characteristics as mitigating.  But the undisputed facts remain: his personal history and characteristics include significant criminality, repeated uses of violence, lack of respect for other people, and willingness to sell drugs to make easy money.

The United States certainly has compassion for any young person who is put into the foster care system at only nine years old, and spends the next several years without a stable home.  ECF No. 124 at ¶¶ 141-44.  But one needs to look no further than Defendant's own siblings to find examples of people who managed to make good choices throughout their lives despite having gone through the same struggles Defendant did.  *Id.* at ¶¶ 142-43.  Each of Defendant's siblings is now a law-abiding member of the Spokane community who does not distribute drugs or sell firearms.  *Id.* at ¶ 142.  Sadly, however, Defendant's siblings (who know him), have had to take steps to ensure that he stays away from their children when he is using, for the children's safety.  *Id.*  So to the extent that Defendant asserts that it is meaningfully mitigating that his upbringing was difficult, it is also important to recognize that it is Defendant himself who has made repeated choices over time that have put him where he is – unlike his similarly-situated siblings.  In short, there is nothing in this PSIR that is significantly mitigating with regard to Defendant's repeated choices to be a drug dealer, rob people's homes, engage in violence and criminal misconduct, and illegally carry loaded guns.  A high-end Guidelines sentence is consistent with his personal history and characteristics.

United States' Sentencing Memorandum – Allen – 19

### C.    Just Punishment, Deterrence, and Protection of the Public

Defendant's significant drug conduct, especially when coupled with his violent history and willingness to carry loaded guns around, demands serious punishment.  It is also vitally important to deter both him and others from engaging in conduct that endangers the public.  In this case, a sentence of 293 months is appropriate, but no greater than necessary, to accomplish these goals.  Remarkably, given the volume of his criminal conduct and the resulting sanctions, nothing has deterred Defendant from committing additional criminal acts.  He and others who are faced with similar choices to deal drugs and use violence need to be disincentivized by the knowledge that if they get caught, there are serious repercussions – especially if their conduct also includes carrying around loaded firearms after multiple felony convictions.

It is fair to the people of the Spokane community – from the Spokane Valley Wal-Mart to the STA bus plaza downtown, from the McDonalds on Indiana and Monroe to the Northern Quest Casino in Airway Heights – that they get to live free of Defendant's illegal drugs and guns while he serves a significant sentence for his crimes against them.

### D.    Avoidance of Unwarranted Sentencing Disparities

The best way to ensure consistent sentences for similarly-situated Defendants across courtrooms, districts, and the country is for courts to apply the Sentencing Guidelines in the same manner everywhere.  Indeed, one of the primary goals of the Guidelines is to create a normative framework so that people with similar conduct and history are treated similarly in the federal criminal justice system, whether their crimes take place in Utah, Iowa, or Washington.  *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007) (recognizing agreement among the Circuit Courts that that "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing"); *United States v. Guerrero-Velasquez*, 434 F.3d 1193, 1195 n.1 (9th Cir. 2006) (recognizing that the

Guidelines "help to maintain uniformity in sentencing throughout the country"); *see United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly.").

That principle maintains its vitality where Guidelines sentences are high. There is no principled reason for Defendant to be in a meaningfully different position from a similarly-situated federal Defendant somewhere else in the United States who likewise has 10 criminal history points (some from acts of violence), deals the same quantity of methamphetamine while constructively possessing a firearm, has an understated criminal history, and is arrested with a loaded, chambered gun in a busy public place while using methamphetamine daily. The United States respectfully submits that the best way to avoid unwarranted sentencing disparity while accounting for *all* of Defendant's conduct is to sentence him within the Guidelines, and to the high end of that Guidelines range.

### E.    Fine, Special Penalty Assessment, and Restitution

Given Defendant's economic circumstances and the nature of the offense, the United States does not recommend a fine or the payment of restitution. ECF No. 124, ¶¶ 153-54. A special penalty assessment of $400 is required.

## VI.    Conclusion

The United States recommends that the Court impose a Guidelines sentence of 293 months, to be followed by 5 years of supervised release, no fine, no restitution, and a mandatory special assessment of $400.

Dated:  February 6, 2024

Vanessa R. Waldref
United States Attorney

*s/ David M. Herzog*
David M. Herzog
Lisa M. Cartier-Giroux
Assistant United States Attorneys

1

<u>**CERTIFICATE OF SERVICE**</u>

2

    I hereby certify that on February 6, 2024, I electronically filed the foregoing

3

with the Clerk of the Court using the CM/ECF System, which in turn automatically

4

generated a Notice of Electronic Filing (NEF) to all parties in the case who are

5

registered users of the CM/ECF system.

6

7

                                        *s/ David M. Herzog*

8

                                        David M. Herzog
                                        Assistant United States Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Certificate of Service – 1